**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

BISHME WALKER,                      :    **Crim. No. GLR-07-0146**

                 Petitioner,       :    **Civil No.   GLR-20-0577**

         v.                        :

UNITED STATES OF AMERICA,      :

               Respondent.      :

                                 :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**<u>SUPPLEMENTAL MOTION TO VACATE JUDGMENT
UNDER 28 U.S.C. § 2255</u>**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................................................ iii

INTRODUCTION .......................................................................................................... 1

STATEMENT OF FACTS ............................................................................................. 2

        A.     Gladstone's Repeated And Outrageous Police Misconduct .................................. 2

               1.     Gladstone's Indictment And Guilty Plea Related To Planting Evidence And Conspiring To Conceal His Actions .................................. 3

               2.     Additional Misconduct By Gladstone Revealed In Connection With Other Officers' Indictments And Plea Agreements ........................... 4

               3.     Similar Misconduct By Gladstone Alleged By Litigants And Reported In The News After Mr. Walker's Trial ........................................ 6

        B.     Gladstone's Indispensable Role In Mr. Walker's Arrest And Conviction. ............ 7

               1.     The Investigation And Arrest ........................................................................ 7

               2.     Gladstone's Critical Role At The Hearing On Motions To Suppress ........ 10

               3.     Gladstone's Critical Role In Mr. Walker's Trial And Conviction ............ 11

ARGUMENT ................................................................................................................ 13

I.     MR. WALKER'S CONVICTION SHOULD BE VACATED BECAUSE GLADSTONE'S EGREGIOUS POLICE MISCONDUCT WAS MATERIAL TO THE OUTCOME OF MR. WALKER'S PRETRIAL SUPPRESSION PROCEEDING AND TRIAL. ............................................................................ 15

        A.     Gladstone Committed Egregious And Impermissible Misconduct. ..................... 16

        B.     The Egregious Misconduct Was Material To Mr. Walker Being Convicted. ........................................................................................................ 17

               1.     Gladstone More Likely Than Not Committed Egregious Misconduct That Was Material To Mr. Walker's Conviction. ................. 18

               2.     The Lack Of Knowledge Of Gladstone's Egregious Misconduct Was Material To Mr. Walker Being Convicted ........................................ 22

II.    THE COURT SHOULD, AT A MINIMUM, SCHEDULE AN EVIDENTIARY HEARING TO EVALUATE THE IMPACT OF OFFICER GLADSTONE'S MISCONDUCT ON PETITIONER'S CASE. ............................................................ 26

CONCLUSION.................................................................................................................................28

## **TABLE OF AUTHORITIES**

Page(s)

### **CASES**

*Burley v. Baltimore Police Department,*
　　422 F. Supp. 3d 986 (D. Md. 2019) ......................................................................3, 6, 7, 16

*Coats v. United States,*
　　No. CR RDB-09-0333, 2020 WL 2794474 (D. Md. May 29, 2020) ................................13

*Foster v. Vignola,*
　　No. CIV.A. GLR-13-3758, 2015 WL 4615905 (D. Md. July 30, 2015) ............................6

*Hall v. United States,*
　　30 F. Supp. 2d 883 (E.D. Va. 1998) ....................................................................13, 15, 18

*Holmes v. United States,*
　　No. 4:08-CV-1142 CEJ, 2011 WL 4445702 (E.D. Mo. Sept. 26, 2011)..............22, 25, 26

*Humphrey v. United States,*
　　888 F.2d 1546 (11th Cir. 1989) .......................................................................................27

*Jones v. United States,*
　　No. 4:10-CV-1748, 2010 WL 4681422 (E.D. Mo. Nov 10, 2010)...................................21

*United States v. Atkinson,*
　　429 F. Supp. 880 (E.D.N.C. 1977).............................................................................16, 25

*United States v. Bagley,*
　　473 U.S. 667 (1985)..........................................................................................................22

*United States v. Battle,*
　　Nos. 92-6077, 93-6009, 1994 U.S. App. LEXIS 11754 (6th Cir. 1994) ..........................21

*United States v. Biberfeld,*
　　957 F.2d 98 (3d Cir. 1992)................................................................................................26

*United States v. Espinosa-Hernandez,*
　　918 F.2d 911 (11th Cir. 1990) ..........................................................................................27

*United States v. Fisher,*
　　711 F.3d 460 (4th Cir. 2013) ........................................................13, 14, 15, 16, 17, 22, 26

*United States v. Fulcher,*
　　250 F.3d 244 (4th Cir. 2001) ............................................................................................26

*United States v. Lipowski*,
    423 F. Supp. 864 (D.N.J. 1976) ........................................................................25

*United States v. MacDonald*,
    No. 3:75-CR-26-F, 2011 U.S. District LEXIS 107625 (E.D.N.C. Sept. 21, 2011) ..........27

*United States v. Silvers*,
    888 F. Supp. 1289 (D. Md. 1995), *vacated in part on other grounds*, 90 F.3d 95
    (4th Cir. 1996)....................................................................................................27

*Williams v. United States*,
    500 F.2d 105 (9th Cir. 1974) .............................................................................21

## STATUTES

28 U.S.C. § 2255(b) ..................................................................................................27

## OTHER AUTHORITIES

Department of Justice, *Former Baltimore Police Sergeant Pleads Guilty to Conspiracy to
    Deprive Civil Rights for Assisting a Member of the Baltimore Police Gun Trace
    Task Force by Planting a Gun at the Scene of an Arrest*, Press release (May 31,
    2019), https://www.justice.gov/usao-md/pr/former-baltimore-police-sergeant-
    pleads-guilty-conspiracy-deprive-civil-rights-assisting .......................................2

Justin Fenton, *More accuse gun task force of violations: Group of alleged victims place
    blame on authorities*, Baltimore Sun (Feb. 3, 2018),
    https://www.baltimoresun.com/news/crime/bs-md-ci-bates-gttf-victims-
    20180202-story.html ...........................................................................................6

Justin Fenton, *Prosecutor who raised early questions about Gun Trace Task Force
    officer speaks out*, Baltimore Sun (Dec. 8, 2017),
    https://www.baltimoresun.com/news/crime/bs-md-ci-jenkins-webb-20171208-
    story.html. ............................................................................................................7

Jessica Lussenhop, *Rogue Baltimore police unit ringleader Wayne Jenkins sentenced*,
    BBC News, Baltimore June 7, 2018, https://www.bbc.com/news/world-us-
    canada-44402948. ...............................................................................................3

Tim Prudente, *Jury Awards $75,000 to man sprayed, yanked down by Baltimore police
    during riots*, Baltimore Sun (Jan. 24, 2018),
    https://www.baltimoresun.com/news/crime/bs-md-ci-lomax-verdict-20180124-
    story.html. ............................................................................................................7

Van Smith, *Bad Seeds*, Baltimore Sun City Paper (Sept. 30, 2014),
    https://www.baltimoresun.com/citypaper/bcp-bad-seeds-20140930-story.html. ...............6

**INTRODUCTION**

Bishme Walker ("Mr. Walker" or "petitioner") hereby moves to set aside the judgment in this case pursuant to 28 U.S.C. § 2255.

As set forth below, Mr. Walker's arrest and conviction for conspiracy to distribute heroin were almost exclusively based on the actions and testimony of one person:  now discredited former Baltimore Police Department ("BPD") sergeant, Keith Gladstone ("Gladstone").  It was Gladstone alone who provided essential testimony about Mr. Walker's alleged possession of the heroin and that Mr. Walker allegedly confessed to intending to distribute the heroin.  In fact, the government only called ***one*** other witness, a different BPD officer who did not see Mr. Walker's arrest or alleged confessions.  Years after Mr. Walker's trial, substantial evidence has surfaced showing that Gladstone repeatedly planted evidence on criminal defendants, made false statements and engaged in other acts of severe police corruption.  Gladstone in fact recently pled guilty to charges stemming from an incident in which he planted evidence on a suspect and later conspired to cover it up.  Further, a number of Gladstone's former BPD colleagues have recently been indicted on corruption-related charges, and their indictments and plea agreements have identified other instances where Gladstone planted evidence and otherwise acted with extreme dishonesty.

While none of this was known at the time of Mr. Walker's trial, the newly discovered evidence completely destroys the credibility of Gladstone's testimony, which was both central to Mr. Walker's conviction and almost entirely uncorroborated.  As a result, the Court should vacate Mr. Walker's conviction, or at a minimum, schedule an evidentiary hearing to fully evaluate whether Mr. Walker's conviction can be sustained in light of the newly discovered evidence of Gladstone's pervasive misconduct.

## STATEMENT OF FACTS

**A.      Gladstone's Repeated And Outrageous Police Misconduct**

Gladstone was a police officer and later sergeant in the BPD from roughly November 1992 to May 2017.  (*See* Indictment at 1-2, *U.S. v. Gladstone*, No. 1:19-cr-00094-CCB (D. Md. filed Feb. 27, 2019) ("Gladstone Indictment") (attached as Ex. 1).)  On February 27, 2019, Gladstone was indicted by a federal grand jury on three counts, respectively of (1) conspiracy to deprive civil rights; (2) conspiracy to commit offenses against the United States; and (3) witness tampering.  (*Id.* at 1.)  On May 31, 2019, Gladstone pled guilty to the first of these counts, admitting to planting evidence on a suspect and subsequently conspiring to lie about it.  (Letter to D. Irwin re: *United States v. Keith Gladstone* at 1, 8-10, May 10, 2019 ("Gladstone Plea Agreement") (attached as Ex. 2).)[1]  The details of Gladstone's misconduct that specifically led to his indictment and guilty plea are set forth below.  In addition, substantial evidence of other misconduct by Gladstone has now surfaced in connection with indictments and guilty pleas of other ex-BPD officers who served with him.  Finally, other similar misconduct by Gladstone has been repeatedly alleged in court and reported by the news since Mr. Walker's trial.

---

[1]      *See also*, U.S. Dep't of Justice, *Former Baltimore Police Sergeant Pleads Guilty to Conspiracy to Deprive Civil Rights for Assisting a Member of the Baltimore Police Gun Trace Task Force by Planting a Gun at the Scene of an Arrest* (May 31, 2019), https://www.justice.gov/usao-md/pr/former-baltimore-police-sergeant-pleads-guilty-conspiracy-deprive-civil-rights-assisting (summarizing that "Gladstone conspired to deprive [the suspect] of his liberty without the due process of law, and conspired to commit offenses against the United States, specifically to impede, obstruct, and influence an investigation"; noting that Gladstone's guilty plea was entered on May 21, 2019).

1.    Gladstone's Indictment And Guilty Plea Related To Planting Evidence
      And Conspiring To Conceal His Actions

The specific crime for which Gladstone was indicted occurred on March 26, 2014, when

he attempted to help his mentee, notoriously corrupt former BPD sergeant Wayne Jenkins,[2]

escape responsibility for deliberately running over a suspect with his police car.  (Gladstone Plea

Agreement at 8; Letter to R. Burke re: *Carmine Vignola* at 8, June 19, 2019 ("Vignola Plea

Agreement") (attached as Ex. 3).)  After running the man over, Jenkins called Gladstone, who

had been dining with fellow BPD officer Carmine Vignola, asking for help.  (Gladstone Plea

Agreement at 8; Vignola Plea Agreement at 8.)  Gladstone then asked Vignola if he owned a BB

gun, intending to plant such a weapon near the suspect, so as to purportedly justify Jenkins's use

of extreme force against him.  (*See* Gladstone Plea Agreement at 8.)  After Vignola replied that

he did not own such a weapon, he and Gladstone retrieved a BB gun from the home of BPD

detective Robert Hankard, before proceeding to the site where Jenkins had run over the suspect.

(*Id.* at 8-9; Superseding Indictment at 2, *United States v. Hankard*, 1:20-cr-00017-CCB, (D. Md.

filed Aug. 11, 2020) ("Hankard Superseding Indictment") (attached as Ex. 4).)  Once there,

---

[2]     Jenkins was the ringleader of the Gun Trace Task Force ("GTTF"), a corrupt unit within
the BPD that was tasked with tracking recovered firearms to curb gun trafficking in the city but
instead regularly stole drugs from suspects and resold them, and planted drugs on innocent
people.  *See, e.g.*, Jessica Lussenhop, *Rogue Baltimore police unit ringleader Wayne Jenkins
sentenced*, BBC News, Baltimore (June 7, 2018), https://www.bbc.com/news/world-us-canada-
44402948.  Seven of the eight BPD officers who comprised the GTTF were indicted on
corruption-related charges.  *Id.*  Jenkins himself "pleaded guilty in January [2018] and admitted
taking part in at least 10 robberies of Baltimore citizens, planting drugs on innocent people and
re-selling drugs he stole from suspects on an almost daily basis, including heroin, cocaine and
prescription painkillers."  *Id.*  He is currently serving a 25-year prison sentence.  *See id.*  (*See
generally* 1/2/18 Letter to S. Levin re: *United States v. Wayne Jenkins*, Cr. No. 17-106 and Cr.
No. 17-638 (Jenkins's plea agreement pleading guilty to, *inter alia*, multiple racketeering
charges, robbery, falsification of records and deprivation of rights) (attached as Ex. 6).)  It
appears that Gladstone was Jenkins's mentor, and that the two regularly worked together and
made arrests together.  *See Burley v. Baltimore Police Dep't*, 422 F. Supp. 3d 986, 998 (D. Md.
2019).

Gladstone placed the BB gun near the suspect's truck and pretended to "find" it there, relaying to officers at the scene that "it's over by the truck."  (Gladstone Plea Agreement at 9.)  After other officers recovered the weapon, the suspect was detained on charges including "possession, use and discharge of a gas or pellet gun."  (Gladstone Plea Agreement at 9.)  Jenkins then submitted a false statement about the probable cause for the suspect's arrest, and the man was not ultimately cleared of charges until January 2015, nearly a year later.  (*Id.*)

Several years later, after Jenkins and six other officers had been arrested on racketeering charges stemming from the GTTF scandal, Gladstone and Vignola arranged to secretly meet to discuss their involvement in the March 26, 2014 incident.  (*Id.* at 9-10; Vignola Plea Agreement at 9-10.)  The two spoke using their wives' cell phones to set up the meeting, so as to avoid detection, and eventually spoke in a YMCA swimming pool so that Gladstone could verify that Vignola was not wearing a wire.  (Gladstone Plea Agreement at 9-10.)  Gladstone then instructed Vignola on how, if he was brought in for questioning, to lie about their and Hankard's involvement in the incident.  (*Id.*)  Testifying before a grand jury in February 2019, Vignola proceeded to lie about the incident, concealing the origin of the BB gun as instructed by Gladstone.  (*See id.* at 10-16.)

### 2.   Additional Misconduct By Gladstone Revealed In Connection With Other Officers' Indictments And Plea Agreements

Additional police misconduct by Gladstone has now been identified in connection with the indictment of and guilty pleas by several of his former BPD colleagues.  For example, it is now known that in February 2009, Gladstone and his former colleagues Victor Rivera and Ivo Louvado misappropriated and profited from the sale of cocaine that had been confiscated from a suspect by the BPD.  (*See* Letter to S. Mercer re: *United States v. Victor Rivera* at 8-9, Mar. 19, 2020 ("Rivera Plea Agreement") (attached as Ex. 5).)  After 41 kilos of cocaine had been turned

4

in to the BPD's evidence unit following a search, Gladstone, Louvado and Rivera discovered an additional three kilos in a van that had been used for surveillance.  (*Id.* at 9.)  Instead of turning in the additional cocaine in, the three "agreed to sell the cocaine and split the proceeds from its sale," and evidentially shared the profits after Rivera engaged an informant to sell the drugs on the street.  (*Id.* at 9.)

In addition, a federal indictment against Hankard filed in August 2020 alleges that Gladstone planted cocaine in a suspect's vehicle, laying the groundwork for the man's arrest and improper conviction.  (Hankard Superseding Indictment at 6-9.)  According to the indictment, in September 2015, Gladstone, Hankard and Vignola (along with others) went to a motel where the suspect was staying and arrested him outside in his pickup truck.  (*Id.* at 6.)  While Hankard and Vignola searched the truck (and did not find drugs), Gladstone and others entered the motel room where the suspect had been staying, without a warrant, and found a woman there and heroin and cocaine that appeared intended for sale.  (*Id.*)  After Gladstone learned that no drugs were found in the suspect's truck, he took some of the cocaine from the motel room and asked Hankard if he was okay with planting it in the truck so as to justify arresting the suspect and entering into the motel room.  (*Id.* at 6-7.)  Hankard agreed and Gladstone proceeded to plant the evidence, which was then recovered by a different officer, and used in conjunction with sworn false statements by Hankard to arrest the man and secure a guilty plea, resulting in an initial ten-year prison sentence that was later reduced.  (*Id.* at 7-9.)

3.      Similar Misconduct By Gladstone Alleged By Litigants And Reported In
The News After Mr. Walker's Trial

According to court statements and news reports issued after Mr. Walker's trial, Gladstone

engaged in substantial additional police misconduct over the course of his BPD career, often

alongside his mentee Jenkins.  These incidents are briefly summarized here.[3]

- In April 2010, Gladstone, Jenkins and others allegedly ambushed two men while
wearing plain clothes and wielding guns, prompting the men to fear they were
being robbed and speed away before driving through an intersection and killing a
bystander.  *See Burley*, 422 F. Supp. 3d at 996.  Gladstone and others then
allegedly planted heroin in the defendants' vehicle, which led to the men later
pleading guilty to drug possession and manslaughter before having their
convictions "vacated, after it was determined that the underlying federal charges
were unfounded and the product of police corruption."  *Id.*  In a resulting civil suit
brought by the men, the vast majority of the plaintiffs' claims against Gladstone,
including violation of due process, malicious prosecution and abuse of process,
survived a motion to dismiss before the suit was settled last year.  *See id.* at 997,
1036.

- In November 2010, Gladstone and Jenkins allegedly arrested a man (Jamal
Walker) during a traffic stop and then went to his home attempting to break in.
*Burley*, 422 F. Supp. 3d at 999.  Other police arrived after Jamal Walker's wife
noticed the break-in attempt and set off a silent alarm, but Gladstone and Jenkins
sent the other police away so that they could purportedly search the home
themselves.  *Id.*  The charges against Jamal Walker were later dropped "'once the
inconsistencies in Jenkins' account came to light.'"  *Id.* (citation omitted).  It
additionally appears that Gladstone and Jenkins confiscated $40,000 from Jamal
Walker's car but kept half of it and reported only $20,000 seized.[4]

- In May 2012, Gladstone participated in an arrest in which a different officer made
a false statement to obtain a search warrant for the suspect's home.  *See Foster v.
Vignola*, No. CIV.A. GLR-13-3758, 2015 WL 4615905, at *2 (D. Md. July 30,

---

[3]      Although Gladstone has not (to petitioner's knowledge) admitted to engaging in the
misconduct discussed in this section, these events have been substantially confirmed by news
reports and constitute important additional evidence that Gladstone repeatedly planted evidence
and secured false arrests.  The probative value of the misconduct described in this section could
potentially be explored at an evidentiary hearing if so ordered.

[4]      *See* Justin Fenton, *More accuse gun task force of violations: Group of alleged victims
place blame on authorities*, Baltimore Sun (Feb. 3, 2018),
https://www.baltimoresun.com/news/crime/bs-md-ci-bates-gttf-victims-20180202-story.html.

2015) (granting summary judgment to the defendant officers in later civil suit). The attesting officer's statement was then "direct[ly] contradict[ed]" by video footage, and the criminal case was eventually dropped, *id.*, but not before the man "was indicted and held in jail for 197 days."[5]

- In March 2014, a prosecutor dismissed a criminal case involving Gladstone and Jenkins after it was revealed that "video camera footage taken of a search of a vehicle 'contradicted the sworn statement of probable cause submitted by the officers.'" *See Burley*, 422 F. Supp. 3d at 999-1000 (citation omitted). Specifically, the footage showed that Jenkins did not find drugs in the suspect's vehicle, contradicting what was said in a different officer's statement of probable cause.[6]

- In May 2015, Gladstone was caught on video grabbing a man who had been protesting the Freddie Gray killing by the hair and pulling him down to the concrete.[7]  The man brought a civil rights suit against Gladstone and another officer, and was awarded $75,000 by the jury.  *Id.* at 999.

### B.  Gladstone's Indispensable Role In Mr. Walker's Arrest And Conviction.

Gladstone was vitally important to the investigation, arrest and conviction of Mr. Walker for conspiracy to distribute heroin and Mr. Walker's resulting over-20-year prison sentence.

### 1.  The Investigation And Arrest

On March 14, 2007, Gladstone and several other police officers arrested Mr. Walker and another man, Lamont Johnson ("Johnson"), after finding heroin in Mr. Walker's vehicle.  Below

---

[5]  Van Smith, *Bad Seeds*, Baltimore Sun City Paper (Sept. 30, 2014), https://www.baltimoresun.com/citypaper/bcp-bad-seeds-20140930-story.html.

[6]  *See* Fenton, *Prosecutor who raised early questions about Gun Trace Task Force officer speaks out*, Baltimore Sun (Dec. 8, 2017), https://www.baltimoresun.com/news/crime/bs-md-ci-jenkins-webb-20171208-story.html.  This report states that Gladstone led the raid on the suspect's home after the false statement was used to obtain a search warrant; it is not clear to what extent Gladstone was otherwise involved.  *See id.*

[7]  Tim Prudente, *Jury Awards $75,000 to man sprayed, yanked down by Baltimore police during riots*, Baltimore Sun Jan. 24, 2018, https://www.baltimoresun.com/news/crime/bs-md-ci-lomax-verdict-20180124-story.html.

is a brief description of events leading up to and immediately following Mr. Walker's arrest, as primarily recounted by Gladstone at the suppression hearing and trial.

On March 14, 2007, a confidential informant told Gladstone that "Bill" would be receiving a large quantity of heroin that day.  (*See* 10/15/07 Trial Tr. (ECF No. 38) 5:17-6:18.) The confidential informant also provided Gladstone with a description of Bill's vehicle, identified its tag number and "point[ed] out" Bill, who Gladstone later identified as Mr. Walker. (*See id.* 6:6-6:10.)[8]  Gladstone and several other officers then located Mr. Walker and began observing him.  (*See id.* 7:2-8:10.)  Around 8:00 that night, Gladstone and the other officers observed Mr. Walker enter a restaurant, Café XS, where he allegedly met with three men and then engaged in a drug transaction with one of the men outside.  (*See id.* 7:8-10:11, 13:9-13:17.) Mr. Walker and this man allegedly entered a Toyota and drove around the block once before stopping by Mr. Walker's vehicle, where Mr. Walker exited the Toyota, got into his vehicle and drove away.  (*See id.*)

Mr. Walker allegedly then drove to and entered a different restaurant, Mo's Seafood Restaurant ("Mo's").  (*See id.* 14:7-14:25.)  As Mr. Walker entered, the officers assumed surveillance positions:  Gladstone stayed in his unmarked van outside of the restaurant and BPD detective William Bearde positioned himself across the street in a parking garage stairwell, while DEA Special Agent Bernard Malone followed Mr. Walker into the restaurant.  (*See id.* 15:1-15:9.)  Johnson then arrived, and Mr. Walker greeted him at the entrance and entered the

---

[8]     Although Gladstone confirmed in a pretrial motions hearing that he stated in an affidavit that the informant looked at Walker and said "that's him," Gladstone later testified that he was not with the informant when the informant identified Mr. Walker, and that instead a different detective (officer Blackwell) was.  (*See* 10/15/07 Trial Tr. (ECF No. 38) 26:14-26:19, 28:21-28:25.)

restaurant with him.  (*See id.* 16:14-16:25.)  The two men remained inside the restaurant for a brief period and then left and entered Mr. Walker's vehicle.  (*See id.* 17:2-18:10.)[9]

After Bearde alerted Gladstone that the men had entered Mr. Walker's vehicle, Gladstone started to approach the vehicle.  (*See id.* 18:11-18:19.)  As Gladstone approached, he illuminated the interior of the vehicle with his headlights and allegedly observed Mr. Walker and Johnson bent over and staring in the center console.  (*See id.* 18:18-18:22.)  Gladstone then exited his vehicle and pointed his flashlight into Mr. Walker's vehicle where he allegedly saw Mr. Walker make a throwing motion towards the back seat.  (*See id.* 18:23-19:12.)  Gladstone then ordered both men out of the car.  (*See id.* 19:25-20:3.)  After both men complied, Gladstone looked in the vehicle again and claims that he saw "two bags right on the floor area, in the front floor of the Honda" that he believed contained heroin.  (*Id.* 20:7-20:14.)  Gladstone then arrested and "[s]eparated" Mr. Walker and Johnson.  (*Id.* 21:14-21:15.)

After placing both men under arrest, Gladstone searched Mr. Walker's vehicle and allegedly found a blue plastic bag in the back seat that contained an additional three bags of what he believed to be heroin.  (*See id.* 21:16-21:19.)  No other drug paraphernalia, such as a scale or tiny plastic bags for distribution, was recovered from Mr. Walker's vehicle.  (*See id.* 158:4-159:3.)  According to Gladstone, he then administered *Miranda* rights to Johnson on the sidewalk and to Mr. Walker in his unmarked van.  (*See id.* 21:19-23:3.)  After this, Gladstone asked Mr. Walker why he was at the current location and Mr. Walker responded that he was there to "get 500 grams."  (*Id.* 23:17-23:22.)  Later that night at the DEA's Baltimore District Office, Gladstone and a different officer (Tracy Geeho) told Mr. Walker that he was in "a lot of

---

[9]     As the men exited the restaurant, Detective Bearde observed Johnson "fidget[ing]" with a "bulge" in his back waistband.  (*See* 10/15/07 Trial Tr. (ECF No. 38) 17:16-17:22, 68:12-68:20.)

trouble, if there was anything he could do to help himself out." (*See id.* 23:25-24:11.)  Mr. Walker then allegedly wrote down "O-Town" on a small piece of paper and showed it to Gladstone and Geeho. (*See id.* 142:3-143:3.)  Mr. Walker then allegedly told Gladstone that he was at Mo's to receive 500 grams of heroin from a man he knew as "Chicken Wing"; that he was receiving the heroin on a "consignment" basis to help him get "back on his feet" financially; and that the heroin could be traced back to "Okey" or "O-Town," who was a substantial heroin dealer in Baltimore city and who was also known as Bill. (*See id.* 24:12-24:23.)[10]

On March 27, 2007, Mr. Walker was indicted for one count of conspiracy to distribute heroin in violation of 21 U.S.C. § 846.

2.     Gladstone's Critical Role At The Hearing On Motions To Suppress

On May 10, 2007, Mr. Walker filed motions to suppress (1) the heroin resulting from the illegal search of his vehicle and (2) his alleged confessions at the arrest and at the DEA's office. (*See* Defendant's Motion to Suppress Statements (ECF No. 15); Defendant's Motion to Suppress Tangible Evidence (ECF No. 16).)  In the former motion, Mr. Walker argued that the search and seizure were conducted without probable cause in violation of the Fourth Amendment. (See ECF No. 16.)  In the latter motion, Mr. Walker argued that the oral statements were given in contravention of the Fifth Amendment and *Miranda*. (ECF No. 15.)  Before the trial commenced on October 15, 2007, the court held a hearing on the suppression motions, where Gladstone was called as the government's "sole witness." (*See* 10/15/07 Trial Tr. (ECF No. 38) 4:8-4:10.) Gladstone testified about the confidential informant, everything that occurred as he approached

_____

[10]     It is unclear from the record if this Bill is the same Bill that the confidential informant allegedly told Gladstone about and then identified Mr. Walker as.

Mr. Walker's vehicle to make the arrest and Mr. Walker's alleged confessions. (*See id.* 4:21-58:14.)

Mr. Walker's counsel then called Bearde as a witness. (*See id.* 58:18-59:5.) Bearde did not corroborate any of Gladstone's testimony; instead testifying, for example, that he did not see the confidential informant or see Gladstone meet with the confidential informant. (*See id.* 61:22-62:1.) Bearde also testified that he did not see the arrest or hear Walker's alleged confession, and that he saw Gladstone give Mr. Walker his *Miranda* warning on the sidewalk rather than in Gladstone's unmarked van. (*See id.* 69:13-71:1.) Moreover, Bearde testified that he surveilled Mr. Walker on Gladstone's orders. (*See id.* 62:16-63:1.) After substantial testimony from Gladstone and brief testimony from Bearde, the court orally denied both motions to suppress. (*See id.* 73:19-73:21.)

3.     Gladstone's Critical Role In Mr. Walker's Trial And Conviction

At trial, the government only called two witnesses: Gladstone and Bearde. (*See id.* 95:22-192:4 (Gladstone's testimony); 192:24-215:6 (Bearde's testimony).) Only Gladstone testified about the key events surrounding Mr. Walker's arrest. In particular, Gladstone alone testified to: (1) seeing Mr. Walker throw something into the back seat of his vehicle (*see id.* 119:1-119:4); (2) seeing heroin on the floor of Mr. Walker's vehicle (*see id.* 119:19-119:22); (3) Mr. Walker's alleged confessions at the arrest and at the DEA's office (*see id.* 126:5-127:19); and (4) seeing the piece of paper on which Mr. Walker allegedly wrote "O-Town" (*see id.* 142:3-143:3).[11]

---

[11]     In addition, Gladstone provided expert testimony as a narcotics officer, opining that Mr. Walker driving around the block in a Toyota with another man near Café XS exhibited signs of a drug transaction. (*See* 10/15/07 Trial Tr. (ECF No. 38) 107:13-107:22, 107:25-109:19, 111:6-111:18.)

The only other evidence the government presented at trial were the bags of heroin allegedly recovered from Mr. Walker and Bearde's brief and non-essential testimony (described below). (*See id.* 120:5-122:13, 192:24-215:6.)  Although Gladstone had seized Mr. Walker's cellphone, no phone records were presented at trial, which could have possibly shown that Mr. Walker talked to Johnson on the phone in furtherance of the alleged conspiracy. (*See id.* 159:4-161:16.)  Further, no physical evidence that Mr. Walker possessed and intended to sell heroin was recovered besides the bags of heroin themselves. (*See id.* 157:19-159:3, 176:18-177:23, 179:12-183:11.)  The five bags of heroin were not fingerprinted because, as Gladstone testified, the case against Mr. Walker was already a "slam-dunk." (*See id.* 129:13-130:18, 176:18-176:21.)  Further, according to Gladstone, Mr. Walker had destroyed the piece of paper with the word "O-Town" written on it, even suggesting that Mr. Walker may have eaten the piece of paper. (*See id.* 50:1-50:13, 55:17-55:25, 143:8-144:21.)  No other drug paraphernalia was introduced against Mr. Walker because no such evidence was ever recovered during the investigation. (*See id.* 158:4-159:3.)

As noted above, Bearde's testimony was short and did not provide facts establishing Mr. Walker's guilt. (*See id.* 192:2-215:6.)  Specifically, Bearde testified that he saw Mr. Walker allegedly make a drug transaction at Café XS, but conceded that he did not "actually witness the arrest" because Bearde was still in the parking garage stairwell making his way down as the arrest was occurring. (*See id.* 196:24-198:15, 199:10-200:25, 204:21-205:19.)  Bearde testified, as he did at the suppression hearing, that he did not witness any of the confessions either. (*See id.* 206:7-206:16.)  In fact, contrary to Gladstone's testimony regarding *Miranda*, Bearde testified that he saw Gladstone read Mr. Walker his *Miranda* rights on the sidewalk, not in Gladstone's van. (*See id.* 205:20-206:2.)  He further testified that he only heard Mr. Walker say

12

that he understood the rights, not that he heard Mr. Walker confess that he went to Mo's restaurant to acquire 500 grams of heroin. (*See id.* 206:3-206:16.)

On October 16, 2007, following the two-day trial, the jury convicted Mr. Walker of the single count of conspiracy to distribute heroin, and Mr. Walker was later sentenced to 262 months in prison. (*See* 10/16/07 Trial Tr. (ECF No. 39) 73:23-74:3.) Since his arrest, Mr. Walker has maintained his innocence. In particular, Mr. Walker believes that Gladstone fabricated the alleged confessions. Mr. Walker also believes that Gladstone lied about receiving information about Mr. Walker from the informant. Mr. Walker also maintains that he was only giving Johnson a ride and was not involved in a conspiracy to distribute heroin with Johnson.

## ARGUMENT

"Under 28 U.S.C. § 2255, a prisoner in custody may seek to vacate, set aside or correct his sentence" where, *inter alia* "the sentence was imposed in violation of the Constitution or laws of the United States" or "is otherwise subject to a collateral attack." *Coats v. United States*, No. CR RDB-09-0333, 2020 WL 2794474, at *3 (D. Md. May 29, 2020). When filing a § 2255 petition to vacate, set aside, or correct a sentence, a petitioner "bears the burden of proving his grounds for collateral attack by a preponderance of the evidence." *Hall v. United States*, 30 F. Supp. 2d 883, 889 (E.D. Va. 1998) (citing, *e.g.*, *Vanater v. Boles*, 377 F.2d 898, 900 (4th Cir. 1967)). The Fourth Circuit has held that § 2255 petitions should be granted when egregious police misconduct played a material role in securing a guilty plea, thereby resulting in a violation of constitutional due process. *United States v. Fisher*, 711 F.3d 460, 467 (4th Cir. 2013). The same principle should apply to criminal convictions secured after trial, as set forth below.

In *Fisher*, the defendant filed a § 2255 petition to vacate his guilty plea after learning that "the law enforcement officer responsible for the investigation that led to the defendant's arrest and guilty plea himself later pled guilty to having defrauded the justice system in connection

13

with his duties as an officer." *Id.* at 462.  Specifically, over a year after Fisher had pled guilty to

being a felon in possession of a firearm, the officer "was charged with various fraud and theft

offenses related to his duties as a DEA officer, including falsely attributing information to a

confidential informant with whom he was splitting reward money." *Id.*  The officer pled guilty

and admitted to making false statements in investigative reports and affidavits supporting

applications for wiretaps, search warrants, and criminal complaints, including specifically in

applying for the search warrant that led to Fisher's arrest and guilty plea. *Id.*

In reversing the district court's decision to deny Fisher's petition, the Fourth Circuit

explained that guilty pleas may be vacated as involuntary when (1) there has been "'some

egregiously impermissible conduct'" that (2) 'influenced [the defendant's] decision to plead

guilty or, put another way, . . . was material to that choice.'" *Id.* at 465 (citing *Ferrara v. United

States*, 456 F.3d 278, 290 (1st Cir. 2006) and *Brady v. United States*, 397 U.S. 742, 755

(1970)).[12]  The *Fisher* court held that this standard was satisfied where there was "gross police

misconduct [that] goes to the heart of the prosecution's case," including a showing "that

impermissible government conduct – an officer's deliberate lie that led to the warrant that led to

the discovery of the evidence against [the defendant] – occurred." *Id.* at 466-67.  The court

emphasized that its approach serves "the important interest of deterring police misconduct,"

because if pleas cannot later be challenged "based on subsequently discovered police

misconduct, officers may be more likely to engage in such conduct, as well as more likely to

conceal it." *Id.* at 469.  Further, "public confidence in our judicial system" would be

---

[12]     Under this two-part test, a petitioner need not establish that the prosecutor knew of the
misconduct at the time of conviction, since "[n]either the timing, nor the prosecution's good
faith" are relevant to the inquiry. *Fisher,* 711 F.3d at 467.  Likewise, a petitioner's "factual
innocence" of the crime is not a "prerequisite to" granting the petition. *Id.*

"undermined" if guilty pleas obtained via severe police misconduct are allowed to stand.  *Id.* at 470.

 *Fisher* concerned a guilty plea rather than a jury trial conviction, but the Fourth Circuit did not purport to limit its holding to cases involving pleas.  Indeed, the court's reasoning applies with equal force to criminal convictions secured after trial that result from police misconduct, which too would only encourage more police misconduct and undermine faith in the judicial system if left to stand.  *See id.* at 469-70.  Accordingly, a highly similar standard should apply here – i.e., the Court should consider whether (1) egregiously impermissible conduct (2) influenced or was material to the outcome of the suppression hearing or trial.  *See id.* at 465-67.

 As set forth below, this standard is easily satisfied here given the centrality of Gladstone's testimony to the result both at the suppression hearing and at trial, and Mr. Walker's conviction should therefore be vacated.  At a minimum, the Court should schedule an evidentiary hearing so that the scope of Gladstone's misconduct and its impact on Mr. Walker's conviction can be fully explored.

**I.** **MR. WALKER'S CONVICTION SHOULD BE VACATED BECAUSE GLADSTONE'S EGREGIOUS POLICE MISCONDUCT WAS MATERIAL TO THE OUTCOME OF MR. WALKER'S PRETRIAL SUPPRESSION PROCEEDING AND TRIAL.**

 Mr. Walker's conviction should be vacated under *Fisher* because the newly discovered evidence of Gladstone's pervasive police misconduct makes it more likely than not that he committed egregious misconduct that was material to the outcome of Mr. Walker's pretrial suppression hearing and trial itself.  *See, e.g.*, *Hall*, 30 F. Supp. 2d at 889 (preponderance standard applies to § 2255 petitions).  Indeed, as set forth below, that Gladstone's history of extreme misconduct was not known to the parties or the Court had itself a material impact on the Court's pretrial rulings and the guilty verdict.  For these reasons, Mr. Walker's due process rights

were violated, and his conviction should be vacated under § 2255.  *See Fisher*, 711 F.3d at 465-67.

### A.      Gladstone Committed Egregious And Impermissible Misconduct.

As a threshold issue, there can be no doubt that the pervasive misconduct that Gladstone engaged in while a sergeant in the BPD qualifies as egregious and impermissible.  While neither the parties nor the Court knew about this at the time of Mr. Walker's arrest and trial, it is now undisputed that Gladstone was a severely corrupt police officer who repeatedly planted evidence to provide a basis for false arrests and otherwise practiced extreme dishonesty.

Specifically, Gladstone has now admitted to planting evidence against a suspect in an attempt to help the also severely corrupt Jenkins escape responsibility for intentionally running the suspect over.  (Gladstone Plea Agreement at 8-9.)  Gladstone later conspired with another officer who participated in the evidence planting to lie about the event, further indicating a propensity for dishonesty.  (*See id.* at 9.)  In addition, indictments of and plea agreements by officers who served alongside Gladstone have revealed that Gladstone (1) misappropriated cocaine that had been seized by BPD and participated in a scheme to sell it for profit (*see* Rivera Plea Agreement at 8-9); and (2) planted cocaine in a suspect's truck to justify his arrest and help impose an unjust 10-year prison sentence (Hankard Superseding Indictment at 6-9).  Finally, since Mr. Walker's trial, a number of other victims of Gladstone's corrupt policing have alleged that he variously planted evidence and was a participant in false arrests.  *See, e.g.*, *Burley*, 422 F. Supp. 3d at 998-1000 (collecting examples of misconduct by Gladstone and Jenkins); *see also United States v. Atkinson*, 429 F. Supp. 880, 886 (E.D.N.C. 1977) (evidence from a different

judicial decision supporting a finding that same witness provided biased testimony was additional new evidence that justified vacatur).[13]

All of this extreme misconduct is highly similar to, if not worse than, the conduct that was deemed egregious and impermissible in *Fisher*.  Indeed, whereas the police officer in *Fisher* had admitted to a pattern of falsifying information in affidavits and investigative reports, *see* 711 F.3d at 463, here there is evidence that Gladstone not only had a propensity for lying, but that he repeatedly went even further and ***planted evidence against*** suspects to secure wrongful arrests and convictions.[14]

For these reasons, Gladstone's wrongful actions as a BPD officer satisfy the requirement of egregious and impermissible conduct.

**B.**      **The Egregious Misconduct Was Material To Mr. Walker Being Convicted.**

Gladstone's egregious police misconduct was also material to Mr. Walker being convicted for two reasons.  First, in light of what is now known about Gladstone's penchant for corruption, the Court should conclude that he more likely than not committed egregious misconduct that was material to Mr. Walker's case.  Second, that Gladstone's propensity for

---

[13]      It further bears emphasizing that Gladstone was the mentor of Jenkins, the leader of the scandalous GTTF and possibly the most corrupt ex-BPD officer recently indicted and convicted. *See Burley*, 422 F. Supp. 3d at 998.  Gladstone and Jenkins appear to have regularly worked together and made arrests together, *see id.*, and it is possible that the two engaged in countless acts of corruption that have never come to light.  In any event, it stands to reason that as Jenkins's mentor, Gladstone at least aided and encouraged Jenkins's severe misconduct, which in and of itself demonstrates severe dishonesty.  Indeed, Gladstone has admitted to attempting to help Jenkins conceal at least one act of violence against a suspect, as discussed herein.

[14]      The fact that Gladstone has not yet admitted to committing these wrongful acts toward Mr. Walker specifically does not mean that his conduct has not been egregious and impermissible.  And as set forth below, Gladstone's misconduct is material to this case even though he has not yet admitted to making false statements or planting evidence against Mr. Walker.

dishonesty was not known at the time of Mr. Walker's pretrial suppression hearing and trial was material to Mr. Walker being convicted because there is a reasonable probability that essential evidence of guilt would have been excluded or discredited at trial.

        1.    <u>Gladstone More Likely Than Not Committed Egregious Misconduct That Was Material To Mr. Walker's Conviction.</u>

To be entitled to relief under § 2255, Mr. Walker must show by a preponderance of evidence (i.e., more likely than not) that his constitutional rights were violated in his conviction. *See, e.g.*, *Hall*, 30 F. Supp. 2d at 889.  Here, the Court can easily conclude that it is more likely than not that Gladstone committed egregious misconduct that materially affected Mr. Walker's case.  The evidence discussed above shows that Gladstone repeatedly engaged in deceitful acts of corruption, including planting evidence against multiple suspects, to secure false arrests and convictions.  This alone makes it highly likely (and certainly more likely than not), that he did the same in Mr. Walker's case, and that Mr. Walker is correct in contending that Gladstone lied about the confidential informant and fabricated all of his alleged confessions.

Moreover, at least three significant inconsistencies in Gladstone's testimony at the suppression hearing and at trial provide strong circumstantial evidence that Gladstone specifically lied to secure Mr. Walker's conviction.  First, at the hearing on the motions to suppress, Gladstone offered inconsistent testimony about the confidential informant who identified Mr. Walker as "Bill," a possible drug dealer.  (*See* 10/15/07 Trial Tr. (ECF No. 38) 5:25-7:3.)  Although Gladstone confirmed that he stated in an affidavit that the informant looked at Mr. Walker and said "that's him," Gladstone later testified that he was not in fact with the informant when the informant identified Mr. Walker, but that another detective, Blackwell, was with the informant.  (*See id.* 26:14-26:19, 28:21-29:2, 29:8-29:22.)  And Bearde could not corroborate the information about the confidential informant because he did not see the

informant and did not see Gladstone meet with any informant.  (*See id.* 61:22-62:1.)  Also casting doubt on Gladstone's testimony regarding the informant, the drug dealer "O-Town" that was referenced in Mr. Walker's alleged confession at the DEA's office is apparently also known as "Bill."  (*See id.* 24:19-24:23.)  Importantly, the tip and purported identification of Mr. Walker by the confidential informant was the entire impetus to investigate Mr. Walker.  (*See id.* 5:17-7:3.)  If Gladstone lied about this informant and the information he received, which is now likely given the pervasive misconduct paired with the inconsistent testimony, then everything that followed – the arrest, the heroin, the confessions – should have been excluded at the suppression hearing.

Second, Gladstone's statements at the suppression hearing about what the police observed in Mr. Walker's car before entering it are inconsistent with the government's response to the motion to suppress and are uncorroborated by Detective Bearde's testimony.  Specifically, in its response to the motion to suppress, the government alleged that Gladstone decided to approach the car only ***after*** observing Mr. Walker and Johnson staring at something in the center console.  (*See* Government's Response to Defendant's Motion to Suppress Evidence (ECF No. 25) at 3.)  However, at the suppression hearing, Gladstone testified that he decided to approach the car after Bearde informed him that Mr. Walker and Johnson entered the vehicle but ***before*** he allegedly observed the two men staring at the center console.  (*See* 10/15/07 Trial Tr. (ECF No. 38) 18:5-18:22.)  Bearde also testified that while he saw Mr. Walker and Johnson enter the vehicle, he could not see the inside of it.  (*See id.* 204:21-204:22.)  Therefore, Bearde necessarily could not have seen Mr. Walker and Johnson looking into the center console of the car. Gladstone also testified that Geeho likely saw Mr. Walker and Johnson looking into the center console and throwing a blue bag (later revealed to contain heroin) into the back of the car.  (*See*

*id.* 45:23-46:2.)  But Geeho never testified and thus never corroborated Gladstone's statement. (*See id.* 142:23-143:3.)

Additionally, Gladstone testified that while standing outside of the car, he observed two bags of a substance that appeared to be heroin on the front floor of the car.  (*See id.* 20:11-20:14.) But in the government's opening statement, the prosecutor stated that the two bags were found in the back seat of the vehicle.  (*See id.* 85:20-86:3.)  When these inconsistencies are viewed in light of Gladstone's pattern of misconduct, his statements surrounding his observations before entering Mr. Walker's car must be discredited.  And without these observations, no probable cause existed to justify the search and subsequent arrest of Mr. Walker leading to the only seized evidence in his case.

Third, Gladstone and Bearde also gave contradictory testimony at the suppression hearing and trial as to where Gladstone allegedly read Mr. Walker his *Miranda* rights.  Gladstone testified that after arresting both Mr. Walker and Johnson, he immediately "separate[d]" the two men.  (*See id.* 21:14-21:15 (suppression hearing); 138:23-139:7 (trial).)  Gladstone then testified that he read Mr. Walker his *Miranda* rights in his unmarked van.  (*See id.* 21:19-23:3 (suppression hearing); 138:23-139:7 (trial).)  Bearde, however, testified that he saw Gladstone read Mr. Walker his *Miranda* rights on the sidewalk next to Johnson – i.e., not separated from Johnson.  (*See id.* 69:10-70:11 (suppression hearing); 205:20-206:2 (trial).)  Moreover, while Gladstone testified that immediately after reading Mr. Walker his *Miranda* rights he confessed to being at Mo's to get 500 grams, Bearde testified that he did not hear Mr. Walker's confession. (*See id.* 23:17-23:22, 70:8-70:24 (suppression hearing); 126:7-126:8, 206:10-206:16 (trial).)  As above, these inconsistencies, in combination with the evidence of pervasive egregious

misconduct by Gladstone that has now surfaced, easily make it more likely than not that Gladstone in fact committed egregious misconduct that materially impacted Mr. Walker's case.

Finally, and in any event, the fact that Gladstone has not as of yet admitted to specifically planting evidence or making false statements in Mr. Walker's case (the latter of which occurred in *Fisher*) does not foreclose a finding of materiality.  Rather, courts have made clear that newly discovered evidence of egregious police misconduct does not have to specifically concern the petitioner's case to justify vacating a conviction, so long as the new evidence sufficiently undermines the credibility of testimony that was critical to securing the conviction.  *See, e.g.*, *Williams v. United States*, 500 F.2d 105, 108 (9th Cir. 1974) (ordering a new trial under § 2255 where the defendant's "conviction [was] based substantially upon tainted evidence" because a key officer witness at the petitioner's trial later pled guilty to perjury relating to "an investigation similar in nature and contemporaneous in time to the investigation of [defendant]"); *Jones v. United States*, No. 4:10-CV-1748, 2010 WL 4681422, at *1-2 (E.D. Mo. Nov 10, 2010) (on a joint motion by defendant and the government, vacating a possession with intent to distribute conviction secured after a jury trial, under § 2255, after the primary officer who testified as to the charges was convicted of several unrelated felony offenses regarding corrupt activities as a police officer); *see also United States v. Battle*, Nos. 92-6077, 93-6009, 1994 U.S. App. LEXIS 11754, at *8 (6th Cir. 1994) (ordering a new trial under Rule 33 where the officer who provided "pivotal" testimony in the defendant's case pled guilty to charges of officer corruption in unrelated investigations that occurred around the time of the defendant's arrest, even though there was "no evidence that [the officer] altered or falsified any of the information presented at [the defendant's] trial").

In one particularly analogous case, *Holmes v. United States*, No. 4:08-CV-1142 CEJ, 2011 WL 4445702, at *1-2 (E.D. Mo. Sept. 26, 2011), a jury convicted the defendant for possession with intent to distribute cocaine following a trial in which the testimony of two police officers provided essentially all of the evidence of guilt. *Id.* at *1-2.  Several years later, new evidence arose showing that these officers were corrupt and dishonest, when one was investigated for making false statements in search warrant affidavits and perjury at trial, and the other pled guilty to stealing seized property and making false statements.  *Id.* at *3.  Even though none of this misconduct specifically involved Holmes or his trial, the court held that the officers' credibility as witnesses had now "been discredited" such that "the government would not have been able to meet its burden of proof" in Holmes's trial.  *Id.* at *6.  The court observed, *inter alia*, that "no witness other than" these officers had testified to crucial facts needed for conviction.  *Id.* at *4.  The court accordingly granted Holmes's § 2255 petition and vacated his conviction.  *Id.* at *6.  The situation here is virtually identical and the same result should follow.

2. The Lack Of Knowledge Of Gladstone's Egregious Misconduct Was Material To Mr. Walker Being Convicted.

Under the standard the Fourth Circuit set forth in *Fisher*, egregious misconduct is material if it "'influenced [the defendant's] decision to plead guilty,'" or in other words, if there is "'a reasonable probability that'" the defendant would not have pled guilty "'but for the misconduct.'" 711 F.3d at 465, 467-68 (citations omitted); *see also, e.g.*, *United States v. Bagley*, 473 U.S. 667, 682 (1985) (favorable evidence is "material" if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different").  Here, that Gladstone's history of corruption was not known to the parties or the Court was material to the outcome in Mr. Walker's case in several ways.

*First*, the lack of knowledge of Gladstone's misconduct was material to the court denying Mr. Walker's motions to suppress evidence that wound up being essential to conviction. Specifically, Mr. Walker moved to suppress the heroin as seized without probable cause and to suppress his alleged confessions, as made without proper *Miranda* warnings.  (*See* Defendant's Motion to Suppress Statements (ECF No. 15); Defendant's Motion to Suppress Tangible Evidence (ECF No. 16).)  After hearing Gladstone's testimony (the only witness presented by the government), the Court denied both motions.  (*See* 10/15/07 Trial Tr. (ECF No. 38) 73:19-73:21.)  Without presuming how the Court would have ruled, petitioner respectfully submits that there is at least a reasonable probability that if the Court knew of Gladstone's egregious acts of corruption, it may have discredited Gladstone's testimony regarding probable cause and the *Miranda* warnings and granted the motions to suppress.  Indeed, combining Gladstone's now known propensity for dishonesty with the inconsistencies between his and Bearde's testimony about the location of the alleged confession, there is a reasonable probability that Gladstone either lied about the confession or that it occurred before *Miranda* warnings and was thus constitutionally infirm.  Likewise, combining Gladstone's pattern of deceit with his inconsistencies surrounding the police's observations inside Mr. Walker's car, a reasonable probability exists that he lied about observing heroin on the floor of the car and any suspicious movements by Mr. Walker or Johnson in the car; thus, no probable cause existed justifying a search of the car.

*Second*, the lack of knowledge of Gladstone's pervasive corruption also materially affected Mr. Walker's trial.  The government's case at trial relied completely on the uncorroborated testimony of Gladstone.  The four key pieces of evidence in the case establishing conspiracy to distribute heroin – Mr. Walker allegedly throwing the heroin into the back of his

vehicle, the heroin on the floor of his vehicle and the two confessions – were based **exclusively** on Gladstone's testimony.  (*See id.* 119:1-119:4, 119:19-119:22, 126:5-127:19.)  In particular, Mr. Walker's alleged confession that he took the 500 grams on "consignment" to "get back on his feet" financially was the key evidence indicating intent to distribute, as the government emphasized in its closing argument.  (*See* 10/16/07 Trial Tr. (ECF No. 39) 22:2-22:11.)  Indeed, the prosecution highlighted the critical nature of Gladstone's testimony at the very end of its closing argument, telling the jury:  "You have to judge [Gladstone's] testimony and see whether it held up to the light of day, it makes sense, whether it was truthful. If you do, you will find the defendant guilty of this case, of the one crime with which he's been charged."  (*See id.* 24:5-24:9.)

Moreover, all of this essential testimony by Gladstone was completely uncorroborated. The only other witness at the trial, Bearde, did not testify to seeing the arrest, the heroin on the floor of Mr. Walker's vehicle or hearing either confession.  (*See id.* 200:23-200:25, 206:3-206:16, 207:16-207:17.)  Additionally, although other officers on the scene and at the DEA's district office, i.e. Geeho and Malone, witnessed the arrest and the alleged confessions, only Gladstone, not those officers, testified.  (*See id.* 142:23-143:3, 149:3-149:5.)  In addition to zero testimony that corroborated Gladstone, no physical evidence corroborated his testimony either. For example, Gladstone did not:  (1) take fingerprints on the recovered bags of heroin; (2) recover the piece of paper on which Mr. Walker allegedly wrote "O-Town" as part of his confession; (3) recover any other physical evidence, such as a measuring scale, to indicate that Mr. Walker intended to distribute the heroin; or (4) present the notes he allegedly took during the confession, which he purports to have somehow lost.  (*See id.* 129:22-130:5, 144:15-145:21,

158:15-159:3, 145:21-147:9.)[15]  And certain of Gladstone's statements are especially dubious in light of his now known propensity for dishonesty – i.e., that he did not take fingerprints because he had a "slam-dunk" case against Mr. Walker already and did not want to waste resources, and that it was Mr. Walker who destroyed the piece of paper on which he had written "O-Town," allegedly by eating it.  (*See id.* 129:13-130:18, 176:18-176:21, 144:15-145:21.)

In sum, the key evidence supporting Mr. Walker's conviction all came from Gladstone, which makes the new evidence destroying Gladstone's credibility highly material to the issues in Mr. Walker's case.  Thus, there is a reasonable probability that a different result would have occurred at the suppression hearing or at Mr. Walker's trial had Gladstone's propensity for egregious misconduct been known at the time.  *Accord Holmes*, 2011 WL 4445702, *6 (vacating conviction under § 2255 where police officers who provided essential testimony had "been discredited" by revelations about their corruption such that the government would not have been able to meet its burden of proof with the remaining evidence."); *Atkinson*, 429 F. Supp. at 885 (newly discovered evidence undermining key witness's credibility justified vacatur where the witness's "credibility and the jury's belief in the truthfulness of his testimony were essential to a finding of Atkinson's guilt"); *United States v. Lipowski*, 423 F. Supp. 864, 867 (D.N.J. 1976) (new evidence undermining key witness credibility "could have been the proverbial 'straw that broke the camel's back' . . ., which would have almost assuredly resulted in a different verdict by the jury").

---

[15]     The government also did not present Mr. Walker's phone or phone records at trial, which could potentially have established that Mr. Walker was in communication with Johnson in furtherance of the conspiracy to distribute heroin.

*    *    *

For the foregoing reasons, it is more likely than not that Gladstone committed egregious police misconduct that was material to Mr. Walker's case.  In addition, that none of the now available evidence of Gladstone's misconduct was known at the time was itself material to Mr. Walker being convicted.  Accordingly, Gladstone's egregious government conduct violated Mr. Walker's due process rights and his conviction should be vacated under § 2255.  *See Fisher*, 711 F.3d at 465-67.[16]

## II. THE COURT SHOULD, AT A MINIMUM, SCHEDULE AN EVIDENTIARY HEARING TO EVALUATE THE IMPACT OF OFFICER GLADSTONE'S MISCONDUCT ON PETITIONER'S CASE.

In the alternative, if the court finds a new trial is not warranted in light of the new evidence destroying Gladstone's credibility, at the very least, an evidentiary hearing evaluating whether Gladstone committed perjury or any other wrongdoing during Mr. Walker's arrest and trial should be held.  *See, e.g.*, *United States v. Biberfeld*, 957 F.2d 98, 103-05 (3d Cir. 1992)

---

[16]     If the Court does not find that relief is warranted under *Fisher*, it should instead vacate Mr. Walker's conviction because:  (1) the evidence of Gladstone's misconduct discussed herein is "'newly discovered, i.e., discovered since the trial'"; (2) Mr. Walker's "'diligence'" with respect to the new evidence can be inferred; (3) the evidence is not "'merely cumulative or impeaching'"; (4) the evidence is "'material to the issues involved'"; and (5) "'the newly discovered evidence would probably produce an acquittal.'"  *See, e.g.*, *United States v. Fulcher*, 250 F.3d 244, 249 (4th Cir. 2001) (citing *United States v. Custis*, 988 F.2d 1355, 1359 (4th Cir. 1989)).  Courts have applied these factors in considering § 2255 petitions filed on the basis of newly discovered evidence of police misconduct.  *See, e.g.*, *Holmes*, 2011 WL 4445702, at *4 (applying materially identical standard to grant Section 2255 petition where newly discovered evidence of police misconduct undermined key testimony).  And these factors are easily satisfied here for all of the reasons explained above.  In particular, the Court can infer Mr. Walker's diligence because Mr. Walker promptly filed his § 2255 petition, within a year after discovering the new evidence, and because his counsel attempted to attack Gladstone's credibility based on the minimal evidence of misconduct that was available at the time.  The newly discovered evidence is not cumulative because it does not duplicate evidence presented at Mr. Walker's trial and is highly probative.  And since Gladstone's now untrustworthy testimony was the linchpin of Mr. Walker's conviction, the new evidence is material, not merely impeaching and would probably produce an acquittal in new trial.  *See, e.g.*, *id.* at *4-6.

26

(granting evidentiary hearing on § 2255 petition so that petitioner's allegations, based on new evidence, that key government agent committed perjury at trial, could be tested); *Humphrey v. United States*, 888 F.2d 1546, 1549-50 (11th Cir. 1989) (granting evidentiary hearing on § 2255 petition where the trial record was "inadequate to show *conclusively*" that critical evidence "w[as] not falsified"); *United States v. Silvers*, 888 F. Supp. 1289, 1298, 1305 (D. Md. 1995), *vacated in part on other grounds*, 90 F.3d 95, 102 (4th Cir. 1996) (explaining that the court had held an evidentiary hearing for Section 2255 petition to assess impact of key witness's perjury and proceeding to vacate conviction); *United States v. MacDonald*, No. 3:75-CR-26-F, 2011 U.S. District LEXIS 107625, at *2 (E.D.N.C. Sept. 21, 2011) (ordering an evidentiary hearing on Section 2255 petition); *see generally* 28 U.S.C. § 2255(b).  Indeed, in similar circumstances, at least one appellate court has held that when newly discovered evidence suggesting a key witness's perjury is at issue, it is an abuse of discretion to not at least conduct an evidentiary hearing.  *United States v. Espinosa-Hernandez*, 918 F.2d 911, 913-14 (11th Cir. 1990) (finding "[t]he District Court abused its discretion in denying Espinosa's motion for discovery into Urso's alleged misconduct and in denying the motion for a new trial without first conducting an evidentiary hearing" because, "[w]ithout the benefits of discovery and an evidentiary hearing, it is impossible to say that evidence of Urso's misconduct is merely impeaching").

As explained above, Gladstone's testimony was absolutely vital to Mr. Walker's conviction.  An evidentiary hearing in this case may uncover even more egregious misconduct – including specifically with respect to Mr. Walker's case.  For instance, a hearing might reveal that Gladstone lied about observing heroin on the floor of Mr. Walker's car before he entered it, or observing Mr. Walker throw something in his vehicle – observations which were the impetus for seizing Mr. Walker and Johnson and searching the car.  The hearing might also reveal that

Gladstone lied about the confessions or never properly issued *Miranda* rights to Mr. Walker.  If either is shown at the hearing, then these key pieces of evidence should have been suppressed, which would have undoubtedly led to acquittal.  Given Gladstone's known history of acting with extreme dishonesty to secure false arrests, as well as the centrality of Gladstone in this case – from investigation to conviction – the court should at least order an evidentiary hearing to determine whether any wrongdoing has tainted Mr. Walker's conviction.

## **CONCLUSION**

For the foregoing reasons, the Court should vacate Mr. Walker's conviction, or at a minimum, schedule an evidentiary hearing to further evaluate the extent to which police misconduct resulted in Mr. Walker's wrongful conviction.


Respectfully submitted,

JAMES WYDA
Federal Public Defender

_____/s/_____
PARESH S. PATEL
Assistant Federal Public Defender
6411 Ivy Lane, Ste. 710
Greenbelt, Maryland
(301) 344-0600
paresh_patel@fd.org

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 1st day of March 2021, a copy of the foregoing

pleading was delivered via electronic filing to Leo Wise, Assistant United States Attorney,

Office of the United States Attorney, 36 Charles Street, 4th Floor, Baltimore, Maryland 21201.


_____/s/_____
PARESH S. PATEL

29